Marcus GORDON et al.

v.

JEFFERSON DAVIS PARISH SCHOOL
BOARD et al.

No. 10902.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

July 22, 1971.

A. P. Tureaud, New Orleans, La., Margrett Ford, Legal Defense Fund, Harvey J. Goldschmid and Peter E. Quint, New York City, for plaintiffs.

Bernard N. Marcantel, Dist. Atty., Jennings, La., for defendants.

EDWIN F. HUNTER, Jr., District Judge:

The target of Supreme Court and Fifth Circuit cases from Brown I to the present has been the dual system. Jefferson Davis Parish has uprooted that system "root and branch". Concededly the system is unitary.[1] There has been no abandonment, no fragmentation.

The case was remanded on June 28, 1971, 5 Cir., 446 F.2d 266:

"* * * with directions for the district court to promptly conduct hearings, and thereon make findings and conclusions as to whether or not the closing of Jefferson Davis High School and Ward Elementary School by the appellee Board was in fact racially motivated. Such findings and conclusions, accompanied by the transcript of the proceeding below, shall be returned to this Court within thirty (30) days for final decision on the question presented."

A hearing was held on July 9, 1971, at which all parties were afforded full opportunity to present evidence. Pursuant to mandate, we enter findings and conclusions. The case may be illuminated by setting forth its nature as it originally seemed to me and as it takes shape after remand.

1. The school authorities did not wish to close either of the two schools (approximately 67% of the black children were already attending predominantly white schools.[2] They preferred to keep both open under a "freedom of choice" plan. No white students elected to attend and this court order-

---

1. The Court's order of June 8, 1970, is made a part hereof by reference.

2. At present only 27.5% of Negroes attend majority white schools in the 32

Northern and Western states (See Race Relations Reporter, Vol. II, No. 12, July 6, 1971).

ed them to take whatever steps necessary to create a unitary, non-racial system.

2. It was in response to that order that the Board, in good faith, presented a plan that had real prospects of dismantling the dual system immediately. The plan worked and Jefferson Davis Parish moved from a totally segregated past to a totally integrated present, while preserving a disciplined atmosphere in which a meaningful education for both races is being afforded.

3. The primary motive of the school authorities in closing the two schools was to bring about a unitary school system. Both schools had presented vestiges of segregation.

"It is the responsibility of local authorities and district courts to see to it that future school construction and abandonment is not used and does not serve to perpetuate or re-establish the dual system. * * * The target of the cases from *Brown I* to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. *One vehicle can carry only a limited amount of baggage.* It would not serve the important objective of *Brown I* to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination." Swann et al. v. Charlotte-Mecklenburg Board of Education, et al, (Supreme Court, decided April 20, 1971), 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. (Emphasis added).

## AFTER REMAND

■ The words "racial motivation" are not merely pious phrases devoid of practical significance. Simplistic arguments have been rejected. A black student in Charlotte, North Carolina might well argue: you are excluding me from School A, two blocks from my home, because I am black, and for no other reason. How can you do that when the Supreme Court in *Swann* declares:

"Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race."

The judicial answer, as enunciated by the Fifth Circuit, is that true non-discrimination may be attained, paradoxically, only by taking race into consideration. Youngblood v. Board of Public Instruction of Bay County, 5 Cir., 430 F.2d 625 (1970), and cases cited therein. The Supreme Court itself has consistently recognized that in the remedial process of school desegregation, race must invariably be considered. Any other approach would severely hamper authorities in their efforts to deal effectively with the task of uprooting the dual system and destroying all vestiges of it.

The remand directs our attention to several cases. Two of these are from this Circuit. In Carr v. Montgomery County, 5 Cir., 429 F.2d 382 (1970), plaintiffs presented the contention that the closing of three specific schools, each of which were operated in the past as all black schools, placed the burden of integration on the black students rather than on white students. The Court held that the record did not support the position of plaintiffs and indicated that each of the three schools had an inferior physical plant or capacity. Moreover, in response to the plaintiffs' argument, the Court noted that the plan also included the closing of some predominantly white schools. The conclusion reached was:

"We therefore conclude that the closing of the three schools here involved is simply a reasonable part of a workable plan of desegregation."

In Wright v. Board of Public Instruction of Alachua County, 431 F.2d 1200 (1970), the problem again arose concerning the discontinuance of two formerly all Negro schools. One was con-

verted into a pupil development center and the court held that there were ample educational reasons to discontinue the other as a high school and to transfer its students to a previously all white high school.

Since the remand on June 28, 1971, our Court of Appeals has handed down two more decisions involving formerly all black schools. In Lee v. Macon County (1971), 448 F.2d 746, Judge Wisdom, speaking for the majority, stated:

> "Closing formerly black school facilities for racial reasons would be such a prohibited form of discrimination. 'Such a plan places the burden of desegregation upon one racial group.' "

The Court proceeded to state that the primary reason for closing the schools was the County Board's conclusion that the use of the black facilities would cause whites to withdraw from the public system. It should be noted, however, that in *Lee* we were not dealing with a unitary school system. Over 45% of the district's Negro students were still in all black, or virtually all black, schools.

In Bell v. West Point Municipal School District (1971), 446 F.2d 1362, the Court of Appeals, in remanding a case to the district court, stated:

> "While it is undisputed that a particular school may be terminated for sound educational reasons, an otherwise useful building may not be closed merely because the school board speculates that whites will refuse to attend the location."

This case did involve a unitary school system, but as a result of the school's being closed, the remaining five schools were forced to conduct classes on "split session" or a "two-shift a day" basis.

When the remand was first received in Jeff Davis on June 28, 1971, it appeared that the Court would face quite a chore and challenge in setting forth conclusions of law. However, in view of *Lee* and *Bell,* both of which were handed down the subsequent week, it does appear that the law insofar as the Fifth Circuit is concerned has now been enun-ciated with clarity. Based on these decisions and two others, all of which were handed down subsequent to the appeal in Jeff Davis, we find the law to be as follows:

## CONCLUSION

■ The construction of new schools and the closing of old are permissible tools to eradicate state imposed segregation. Decisions concerning which schools to utilize are to be resolved on some rational non-discriminatory basis by local school authorities. Closing formerly all black schools merely because the school authorities believe that whites will refuse to attend the location or support the school system is not constitutionally permissible. However, if there are valid educational reasons for closing it is perfectly permissible for the school board to do so. If, on the other hand, the closings are without other valid educational reasons, then and in that case the closings constitute racial motivation in violation of the Fourteenth Amendment. To put it more bluntly, vestiges of the dual system cannot be uprooted by closing formerly all black schools unless independent educational reasons exist for the closing.

The issue is fairly joined: Were there valid educational reasons for closing other than the belief on the part of the school authorities that this was the only plan that would work because of so-called "white flight."

*The Schools—*

### JAMES WARD ELEMENTARY SCHOOL

1. James Ward Elementary School has two classroom wings, containing nine conventional classrooms, which were constructed during the last six years. In addition, Ward has nine conventional classrooms in a 31-year old portion of its building. Ward also has a lunchroom, which is six years old, a gymnasium and a library. It is on a six-acre plot.

2. Ward has a semi-circular driveway with a covered bus-port and covered

waiting areas. Students are discharged and picked up by busses at the school door, and not on the street. Because of the covered bus-port and waiting areas, students being discharged and picked up by busses at the school remain dry even in wet weather. Ward is located on South Cutting Avenue, a road which is free from heavy traffic.

3. The Ward structure is extremely safe. In the case of fire (there has never been one), the building can be emptied through numerous exits in less than two minutes. During a recent hurricane, residents of the surrounding neighborhoods took shelter in the Ward building, as the safest building in the area.

4. The Superintendent of Schools of Jefferson Davis Parish classified the Ward building as in "good condition."

5. The school authorities did not wish to close the school, but desired to continue it on a "freedom of choice." This did not bring a unitary system, and the Board then presented the plan which dismantled the dual system by closing the school.

6. The only reasons for closing Ward were the School Board belief that whites would refuse to attend the Ward location, the loss of public support for the school system, and the fact that if whites did not attend the location there would still be an all black school.

7. No other valid educational reasons existed for closing Ward.

8. Ward is a mile distant from Southside Elementary, a previously all white school which the Board has kept open. Southside has seven of its eight conventional classrooms in a 48 year old building. It has no gymnasium, it was classified by the Superintendent as in "fair condition."

9. Of the 18 classrooms in Ward, 13 remain vacant and unused. The other five were leased during the 1970–71 school year to a federal Head Start Program. Approximately 125 Head Start pupils used the building on an integrated basis. Approximately 50% of these are white, 50% black.

JEFFERSON DAVIS HIGH SCHOOL

1. Two grades of black students continued to attend Jefferson Davis after the November, 1969, fire for the eight-month balance of the 1969–70 school year.

2. Beginning September, 1970 and for the 1970–71 school year, these students were transferred to Jennings High School. One of the reasons for the transfer was the feeling that white students would not attend the formerly all black school location, but there were in my judgment other valid educational reasons existing for the closing of Jeff Davis High, and for the consolidation of Jeff Davis and Jennings High as one high school:

(a) The physical facilities at Jeff Davis were pretty well gutted by the fire of November, 1969. Eleven classrooms were lost, as were the administrative wing, restrooms, and other facilities.

(b) Nothing is more starkly evident than that structurally this school is literally in shambles and cannot possibly be fit for occupancy for the term of school beginning in September of 1971. Financial statements entered into the record reveal that no monies at all are in the capital improvement fund and the maintenance fund contains only some $5,433.27.

(c) The condition of the facilities and structure were described in detail by Mr. Butson at the hearing last week (Tr. 48–56). Hot water heaters are missing. Ceilings are torn down. Copper and brass has been dismantled. The dishwasher has been relieved of its electrical parts. Windows are broken, etc., etc., etc. There is no administrative part of the building remaining. There is substantial structural damage to the part of the building which was not visibly affected by the fire.

(d) Jeff Davis High School is located on the outskirts of the city on a narrow blacktop road with rather deep ditches on either side. See Item No. 3 of plaintiffs' Exhibit revealing the location of the various schools.

(e) There is just no need for two high schools to house the 900–1000 high school students in Jennings. Consolidation is certainly economically feasible, and Jennings High is by far and away the better of the two plants.

(f) The testimony of Mr. Neely is to the effect that it is just not sound educational policy to separate the Ninth Grade from the remainder of the high school, because often a pupil will fail a subject and have to repeat it although he advances to the Tenth Grade level in other subjects. The separation would force commuting by some of the students from one high school to the other for certain subjects.

(g) Adequate funds are not available for rebuilding a high school for a Ninth Grade facility without an administrative wing, without special laboratories, without band and vocal music or vocational facilities, but with all attendant of course failures.

### ADDENDA

We are persuaded that the school authorities in Jefferson Davis Parish are endeavoring to furnish the best possible education to all of its citizens. No one holds a monopoly of insight into tomorrow. Perhaps the Parish can still have a totally unitary system with James Ward and/or Jeff Davis open. Surely, it will take the wholehearted cooperation of the entire community, black and white. Perhaps pertinent is the colloquy between the Court and Mr. Ward, former Principal of the Ward Elementary School and now Assistant Principal of Jennings High (Tr. 131):

THE COURT: * * * I don't know whether this is all that important, I understand that there is no monolithic thinking among White people and Black people on all this. It's divisions of opinion, we all understand that, but you certainly are a responsible representative, but the Court of Appeals is going to make the final decision in this case, not me. I am just having this hearing to make findings of fact to send back to them. They kept this case. But suppose as a result of everything that has happened here that it ends up with one White school closed and one Black school closed and that's what would happen if the Jeff Davis High School is closed and remains closed, that was a formerly Black school, but a formerly White school was also closed, which would be Southside.

MR. MARCANTEL: Southside.

THE COURT: Southside.

THE COURT: In other words, we would say, well, in order to get perfect integration we will close one White school and we will close one Black school. What would you think about that? What would be your idea on that?

THE WITNESS: I think this would relieve some of the hostilities that existed in the Black community.

THE COURT: I would think that that might be a possible solution, but that is for the Court of Appeals and not me. Proceed, sir.

We receive weekly slip opinions in which cases are remanded to the district court with directions to instruct the school board to present plans based on the principles embraced in Swann et al. v. Charlotte-Mecklenburg Board of Education et al. It is respectfully suggested that under no circumstances should that be necessary in this case. The plaintiffs have suggested the possibility that the school board might close Southside Elementary School, a small 48 year old structure, which is the most physically inferior school building in Jennings, and send the Fifth Grade, which is now in Southside, to James Ward Elementary, which has superior facilities and where the students would

be easily accommodated. The plaintiffs further suggest that if the courts decide that Jeff Davis High must be re-opened that it should be re-opened to accommodate the 300–350 students projected for the Jennings High Ninth Grade.

In closing we feel that something should be added about the so-called temporary structures. These are not throw-away structures. They are air-conditioned, neat, spacious, and have facilities which are adjustable to the age and grade of the students. I think it would be incorrect to conclude that these structures are in any way educationally inferior.[3]

3. "Thus the board of education of Los Angeles has decided that fully 25 percent of that city's classrooms will, in the future, be temporary structures that can be moved around as needed. Every major United States school district today uses some temporary classrooms. More are on the way. Indeed, temporary classrooms are to the school construction industry what paper dresses are to the clothing industry—a foretaste of the future." Future Shock, by Alvin Toffler (Random House, New York, Page 51).