Kenya HILL, Feneisha Hill, Minor Children, By and Through Their Parents and Guardians, William M. HILL and Sherry A. Hill, Brandon Turner, Daniel Turner, Heather Turner, Minor Children, By and Through Their Parents and Guardians, Danny B. Turner and Kathy V. Turner, Danielle Jones, Jeremy Lee Jones, Minor Children, By and Through Their Parents and Guardians, Anthony Jones and Rosetta Jones, Leterrence Darnell Johnson, Minor Child, By and Through His Parent and Guardian, Hope Denise Lancaster and Tracey Lancaster, Greene County Branch of the National Association for the Advancement of Colored People

v.

GREENE COUNTY SCHOOL DISTRICT; Greene County Board of Trustees; Wilma Leverette; Marvin Welford; Gerald Denmark; Lavell Henderson; George Perkins.

Civ. A. No. 2:89–cv–151WS.

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

Feb. 2, 1994.

Michael Adelman, Hattiesburg, MS, for plaintiffs.

James A. Keith, Jackson, MS, for defendants.

## MEMORANDUM OPINION

WINGATE, District Judge.

Before the court is plaintiffs' motion for an injunction pursuant to Rule 65, Federal Rules of Civil Procedure, to require the defendant Greene County School District to reopen the State Line Elementary School located in State Line, Mississippi. Plaintiffs here are students who attended State Line Elementary School, their parents, and the Greene County Branch of the National Association for the Advancement of Colored People (hereinafter "NAACP"). Defendants are the Greene County School District, Greene County Board of Trustees, Wilma Leverette, Marvin Welford, Gerald Denmark, Lavell Henderson, and George Perkins. State Line Elementary School programmed to neighborhood children in grades K to 8. In 1988, State Line Elementary was closed by the Greene County School District (hereinafter "School District") after School District authorities learned that the physical plant of the elementary school contained friable asbestos,[1] which, all agree, poses a serious health hazard. Aggrieved over the closure, plaintiffs have charged in their complaint that defendants' action violates the Fourteenth Amendment[2] of the Constitution of the United States, as well as Title 42 U.S.C. § 2000d.[3] In a nutshell, plaintiffs charge that the defendants' motives in closing State Line, a predominantly black school, were rooted in racial animus. Plaintiffs thus ask the court to find racial discrimination here and order the defendants to reopen the school, after it has been renovated in accordance with the criteria imposed by the Mississippi Department of Education to provide a clean and safe environment. Defendants oppose plaintiffs' request for injunctive relief, vigorously denying any racial animus, while asserting dilemmas of the pocketbook as the sole cause of the school's closing.

This court has held a lengthy hearing on the matter, having heard from a number of live witnesses and having received into evidence voluminous documentary material relating to the demographics of Greene County, the School District's transportation program, the physical condition of the elementary school, and the proceedings conducted by the official bodies entrusted with the operation and maintenance of the Greene County Schools. Fully educated by the pointed and, in some cases, passionate testimony of the witnesses for both sides and the mass of relevant documentary material, this court is persuaded to deny plaintiffs' request for an injunction.

## PROLONGED ATTEMPTS TO SETTLE THIS DISPUTE

Several times since the evidentiary hearing in this dispute, the court and the parties wrongfully concluded that this lawsuit was on the verge of settlement. As always, this court encourages parties to reach an harmonious compromise if such is attainable. Settlements conserve judicial resources, obviate appeals, foster goodwill, and allow both sides to claim a measure of victory. The efforts at

---

1. Friable asbestos is material easily crumbled or reduced to powder.

2. The Fourteenth Amendment provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1.

3. Title 42 U.S.C. § 2000d provides as follows:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

,resolving this dispute were remarkable in that the efforts spanned over two years and contemplated some original solutions. Generally, where the court probes at settlement but finds no bedrock basis in a short time, the matter is reactivated on the judicial calendar and resolved juridically. However, this case was an atypical one, in that both sides expressed keen interest in reopening the school and both sides were willing to exhaust amicable, unified efforts towards resolving the matter before requesting a ruling on plaintiffs' motion for an injunction. Both sides favored a school in the State Line area and neither side wanted in its midst an asbestos-laden, abandoned, unusable school complex containing classrooms, a gymnasium, a cafeteria, and a band room. While plaintiffs sought to compel defendants to renovate the school and clean out the asbestos, plaintiffs were sharply aware of defendants' statements that the School District not only was financially unable to remove the asbestos, but also was financially unable to acquire the requisite Environmental Protection Agency (hereinafter "EPA") demolition certificate and personnel to tear down the structure. So, in good faith, the parties conferred and collaborated on efforts to resolve this lawsuit short of a court resolution.

First, the parties explored the prospect of gaining the approval of the School District electorate for the issuance of school bonds. After the initial hearing in this action, the parties entered into an agreed Provisional Consent Judgment, which in part provided for a bond issue election to fund the asbestos removal and also to make the necessary capital improvements at State Line to bring the school into compliance with the State Department of Education standards of accreditation. However, the June 5, 1990, bond election failed by a vote of 325 (15%) for and 2,033 (85%) against. The State Line precinct voted against the bond issue by a margin of 137 (43%) for and 157 (57%) against. Under state law, the bond issue required a 60% margin to pass. *See* Miss.Code Ann. § 37–59–17 (1972) (effective March 3, 1987).

Notwithstanding the failed bond issue, the parties pressed on with additional efforts to find a non-judicial solution. The plaintiffs investigated measures of raising the needed monies themselves. The defendants sought grants from the State and various organizations. These attempts failed.

Then, the court and parties hit on the idea of seeking the services of experts who, free of charge, would remove the asbestos. When personnel with the requisite expertise assigned to the United States Keesler Air Force Base in Biloxi, Mississippi, agreed to remove the asbestos at State Line Elementary at no cost to the School District, all counsel deemed this to be a miraculous solution.

In October of 1990, the Keesler personnel began the removal process, but the friable material was worse than originally expected. Keesler personnel reported that they would need special air filtration machinery to complete the job. This machinery was not immediately available at Keesler Air Force Base, but was on back order. Consequently, the clean up project at State Line Elementary School was delayed while the new machinery made its way to the Air Force base. After the machinery's arrival, more delay was encountered. The Air Force experts had to obtain special permission through military channels in order to use the machinery on a volunteer project such as the asbestos clean-up project at State Line Elementary.

Eventually, permission was obtained to use the new machinery, but another development stopped the asbestos removal project in early 1991. Although the Keesler Air Force Base personnel were federally certified to conduct asbestos removal operations, these experts were not licensed in accordance with the higher standards imposed by Mississippi Commission on Environmental Quality regulations which became effective in November of 1990. Accordingly, Keesler personnel could not proceed without obtaining either state certification or a special exemption from the state authorities. Martha Sartor, coordinator of community projects at Keesler Air Force Base, enlisted the assistance of defendants' counsel to expedite this matter.

In their attempt to surmount this hurdle, defendants' counsel contacted the Attorney General's Office of the State of Mississippi. Defendants were directed first to chief counsel for the Natural Resources Division, then

to counsel for the Mississippi Department of Environmental Quality. However, the Department of Environmental Quality eventually determined that only one of the Air Force personnel was qualified to conduct the project under Mississippi's regulatory requirements. In order to gain certificates under these regulatory requirements, the non-qualified Keesler personnel would be required to participate in a refresher course approved by the EPA.

Defendants contacted Martha Sartor and informed her of the state's requirements. She responded that while Keesler personnel would be happy to become certified pursuant to Mississippi's regulations, Keesler Air Force Base could not justify the expense of doing so for just one project. Ms. Sartor suggested that the defendants contact Ben Rosenkrans, Director of Continuing Education at Mississippi State University. When contacted, Mr. Rosenkrans stated that six Keesler personnel could be trained, one as a supervisor and the rest as asbestos workers at a cost of $2,350.00. Defendants' counsel then recommended to the School District that this be done. However, according to the defendants, the School District continues to

suffer cuts in funding and has been barely able to meet its normal operating expenses. Hence, say defendants, the School District has been unable to allocate funds for training the Keesler personnel.

Frustrated by these constant hurdles and pessimistic about finding a non-judicial solution, the plaintiffs have asked the court to place the case back on its active docket and to move it along the judicial pathways to a resolution. Accordingly, the court now stands ready to rule on plaintiffs' request for injunctive relief, based upon the evidence presented at the earlier evidentiary hearing.

### PERTINENT FACTS

The School District operates three elementary schools, one junior high school and one high school. Prior to July 10, 1989, the School District operated a fourth elementary school at State Line, Mississippi. According to defendants' Exhibit 1, the racial breakdown of the student enrollment at each of the schools in the district immediately before and after the closure of State Line Elementary School was as follows:

### LEAKESVILLE ELEMENTARY

|  | 1988 |  |  | 1989 |  |
|---|---|---|---|---|---|
| B | W | TOTAL | B | W | TOTAL |
| 62 (17.5%) | 292 (82.5%) | 354 | 130 (26.3%) | 364 (73.7%) | 494 |

### McLAIN ELEMENTARY

|  | 1988 |  |  | 1989 |  |
|---|---|---|---|---|---|
| B | W | TOTAL | B | W | TOTAL |
| 122 (44.4%) | 153 (55.6%) | 275 | 114 (42.7%) | 153 (57.3%) | 267 |

### SAND HILL ELEMENTARY

|  | 1988 |  |  | 1989 |  |
|---|---|---|---|---|---|
| B | W | TOTAL | B | W | TOTAL |
| 21 (6.7%) | 292 (93.3%) | 313 | 6 (2.1%) | 287 (97.9%) | 293 |

### STATE LINE ELEMENTARY

|  | 1988 |  |  | 1989 |  |
|---|---|---|---|---|---|
| B | W | TOTAL | B | W | TOTAL |
| 197 (74.6%) | 67 (25.4%) | 264 | —— | —— | —— |

From these statistics, one immediately notes that of the four elementary schools, only State Line had a predominantly black student population in 1988. Upon State Line's closure, no elementary school was predominantly black.

Plaintiffs contend that defendants historically have ignored State Line Elementary, while reserving all of the perks for the majority-white elementary schools. Pursuant to this discriminatory attitude, according to plaintiffs, the defendants have permitted

State Line Elementary to fall into a deplorable state of repair since 1969 when State Line Elementary became a predominantly African American school. As an example of the School District's discriminatory treatment, plaintiffs cite the variant circumstances relative to the defendants' installation of new heating units at Sand Hill and State Line elementary schools. While Sand Hill's needs were met quickly in January of 1988, say plaintiffs, State Line Elementary had to wait until the fall of 1988, and only then was awarded the new heating unit after parents complained to the Department of Education's Office of Civil Rights (hereinafter "OCR").

Relative to the closure of State Line Elementary, plaintiffs contend that asbestos was found not only at State Line Elementary, but also at McLain and Sand Hill. No attempts were made to close these schools, charge plaintiffs.

Additionally, charge plaintiffs, the consequences of defendants' choice to close State Line Elementary in the long run will prove a more costly decision than one to remove the asbestos. According to the plaintiffs, a feasibility study conducted by the School District revealed that the friable asbestos could be removed from State Line Elementary at a cost of approximately $44,000.00. Contrariwise, the cost of closing State Line Elementary includes the added expenses incurred by the School District in bussing former State Line Elementary students to their newly-assigned schools. The increased financial cost, say plaintiffs, at a minimum amounts to $67,000.00 per year. And, continues the plaintiffs, even the defendants' experts project additional transportation costs of approximately $20,000.00 per year.

Plaintiffs aver that in the aftermath of State Line Elementary School's closure, they have been subjected to yet another cost, the psychological strain imposed upon students of tender years who must endure bussing over great distances and upon parents who fret over the safety of their children constantly exposed to the possibility of highway accidents.

In summary, plaintiffs claim that the School District's decision to close State Line Elementary was predicated on racially discriminatory reasons and that the unsoundness of the decision is manifest by the consequential, adverse unbalanced costs, both financial and psychological. Plaintiffs are convinced that a neighborhood school[4] would better serve their educational needs and would be a needed, accessible magnet for community projects. Accordingly, plaintiffs campaign for an injunction from this court which would order the reopening of the school.

The defendants take umbrage at plaintiffs' charge of racial discrimination. Taking the offensive, defendants point out that since 1975 the School District has operated under a voluntary desegregation plan administered by the OCR. On several occasions since 1985, say defendants, the OCR has investigated complaints that the School District violated the desegregation plan, but found such complaints unsubstantiated. In support of this statement, defendants hold up defendants' Exhibit 5, a letter from the OCR to the Superintendent of the School District. This letter reflects that on February 17, 1988, the OCR summarized its investigation regarding complaints of race discrimination in the administration of discipline and handicap discrimination in violation of federal law. According to Exhibit D–5, the OCR found that, "the District's discipline practices appear to comply with the requirements of Title VI, 42 U.S.C. § 2000d, et seq., and the District did not violate Section 504."[5]

---

4. Audrey Fisher Brown, NAACP representative from Washington, D.C., testified that neighborhood schools were preferred and served the best interest of the children. This view marks a departure from the NAACP's previous position that neighborhood schools hinder the attainment of a unitary school system. The NAACP now prefers the neighborhood school concept, despite its tendency to foster single-race schools.

5. Title 29 U.S.C. § 794 (section 504) provides:
   No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal

Next, the defendants submit defendants' Exhibit 6, another letter from the OCR to the School District. This correspondence shows that on January 6, 1989, the OCR responded to complaints of racial discrimination in: (1) the comparability of services and courses among the schools in the district; (2) the certification of principals; (3) the disbursal of funds to schools; and (4) the assignment of teachers. Defendants proudly point out that according to Exhibit D–6, the OCR found that, "the District is in compliance with Title VI regarding comparability, certification of principals and the disbursal of funds." Furthermore, the letter concluded that based on "the assurance provided by the District to resolve the [violation concerning assignment of teachers], we consider the District to be presently fulfilling its compliance with respect to Title VI."

Then, defendants offer defendants Exhibit 7, another in a series of letters reporting the OCR's findings to the School District. In this letter dated January 30, 1989, the OCR found the School District to be in compliance with Title VI regarding the employment of black principals and placement of the educable mentally retarded.

On March 7, 1990, the OCR concluded its review of complaints concerning race discrimination in (1) assignment of teachers and (2) transportation of black students to State Line. The OCR found that "teachers have now been assigned in accordance with the District's desegregation plan" and that the "closing of State Line Elementary School furthers desegregation of the Leakesville Elementary and Leakesville Junior High Schools and resolves a health factor due to the concentration of friable asbestos present in State Line School." (See defendants' Exhibits 8 and 9).

Defendants conclude that these OCR findings show that the School District over the years has been subjected to close observation by the OCR and that in every occasion, even after the School District voted to close State Line Elementary School, the OCR has determined that the School District was in compliance with its desegregation plan.

Relative to plaintiffs' contention that the School District accorded State Line Elementary inequitable treatment, the defendants deny the charge and assert that they have fairly distributed the few, precious funds it had.

Addressing the dispute surrounding the installation of heating units at Sand Hill and State Line Elementary, the defendants say that they had to install the heating unit at Sand Hill first for an understandable reason: the Mississippi State Fire Marshal had threatened to close the school in December of 1987 unless the heating system was repaired immediately.

The defendants acknowledge plaintiffs' next allegation that while asbestos was found also at McLain and Sand Hill, that only State Line Elementary was closed. But, defendants point out that only State Line Elementary had friable asbestos,[6] the most dangerous type as it is material easily crumbled or reduced to powder.

While the plaintiffs contend that the defendants have not been forthcoming with the funds required to overcome the asbestos health hazard, defendants respond that the absence of more significant monetary support by the School District to the elementary school at State Line resulted from the School District's precarious financial condition, rather than from any invidious racial discrimination. The defendants offer several examples to support their statements that they were monetarily unable to remove the asbestos health hazard. For example, in December of 1988, say the defendants, the State Department of Education placed the Greene County School District on probation for deficit financing in violation of state law (Miss.Code

Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments of this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

6. The other types of asbestos are non-friable and stable and do not present an immediate health hazard.

Ann. § 37–19–61) and State Department of Education Regulations. This probationary status was still in effect when the School District voted to close State Line in July 1989 and when this court initially heard this dispute in October 1989.

Notwithstanding the School District's probationary status, the defendants contend that after the discovery of the asbestos, they took a number of steps, without success, to comply with federal law regarding removal of asbestos pursuant to 15 U.S.C. § 2641.[7] Defendants say the school board considered enclosing or sealing the area containing the asbestos, but could not be assured that this alternative was safe. According to the defendants, no federal or state agency had funds available for removal of asbestos. So, after advertising, the defendants say on June 8, 1989, the School District received a bid of approximately $51,000.00 from a private contractor to remove the asbestos from State Line Elementary. However, the School District had a budgetary deficit of $750,000.00 at the time this bid was received. Therefore, continue the defendants, believing there was no other alternative, on July 10, 1989, the School Board voted to close State Line Elementary pending receipt of funds to cover removal of asbestos. According to the defendants, the Board took this action rather than incur an additional debt to remove the asbestos and further increase the deficit.

The defendants give additional examples of the financial straits they have navigated while remaining unable to address the asbestos problem at State Line Elementary School. For instance, say defendants, during the summer of 1989, the School District received $216,776.00 from the Greene County Board of Supervisors pursuant to the "shortfall" statute, Miss.Code Ann. § 27–39–333. This statute provides that a school district may borrow money in anticipation of ad valorem taxes it may receive. The school district used these funds to meet payroll and operating expenses. By law, this money could not be used to remove asbestos.

In order to raise cash for regular operating expenses, defendants note that the School District borrowed money in mid–1989 pursuant to Miss.Code Ann. §§ 37–59–101 to 111.[8] Defendants say this money is to be repaid over three years by an assessment of one mill per year. Under this procedure, a school district adopts a resolution specifying how the money will be spent. *See* Miss.Code Ann. § 37–59–103. A resolution was adopted on February 19, 1989, to pay off the heating units at State line Elementary and Sand Hill Elementary schools. The School District paid off prior obligations arising from the construction of Greene County High School, renovated the heating unit at Leakesville Junior High School, made repairs at McLain Elementary School, and purchased replacement school buses. According to the defendants, the "3-mill" money is to be repaid through an increase in ad valorem taxes, but could not be applied to remove asbestos.

Defendants explain that the School District also received money from the sale of sixteenth section timber. However, a State Forestry Commission mandate required that the proceeds be applied to the School District's deficit.

In conclusion, say the defendants, the State Line Elementary School is in poor

7. Title 15 U.S.C. § 2641(b) provides as follows:

The purpose of this subchapter is—
(1) to provide for the establishment of Federal regulations which require inspection for asbestos-containing material and implementation of appropriate response actions with respect to asbestos-containing material in the Nation's schools in a safe and complete manner;
(2) to mandate safe and complete periodic reinspection of school buildings following response actions, where appropriate; ...

8. Miss.Code Ann. § 37–59–101 provides as follows:

The school board of any school district in the county is authorized and empowered, in its discretion, to borrow money under the terms and conditions specified in this article for the purpose of making repairs, alterations and additions to school buildings of such school districts, for the purpose of erecting school buildings and other buildings used for school purposes, for the purpose of purchasing heating plants, fixtures and equipment for such buildings, for the purpose of purchasing land for school purposes, school buses and transportation equipment, and for the purpose of improving and equipping such lands for school recreational and athletic purposes.

physical condition; the asbestos-infected buildings pose a significant health hazard to faculty and students who would attend the facility and breathe its atmosphere; the School District would surely lose state funding even if it callously ignored this danger and sought to operate the school in this condition; and presently, the School District's pocketbook is simply not large enough to fund removal of the asbestos. Accordingly, conclude defendants, they had no option available to them except to close the school and bus its students elsewhere.

### APPLICABLE LAW

*Canal Authority of State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974), is the case most often cited for the four factors this court must consider when determining whether to issue a temporary restraining order or preliminary injunction. Those factors are as follows:

(1) a substantial likelihood that plaintiff will prevail on the merits,

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,

(3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to the defendant, and

(4) that granting the preliminary injunction will not disserve the public interest.

*Id.* at 572; *see also Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 163 (5th Cir. 1993); *Black Fire Fighters Ass'n v. City of Dallas, Tex.,* 905 F.2d 63, 65 (5th Cir.1990); *Allied Mktg. Group, Inc. v. CDL Mktg. Group, Inc.,* 878 F.2d 806, 809 (5th Cir.1989); *White v. Carlucci,* 862 F.2d 1209, 1211 (5th Cir.1989); *Plains Cotton Coop. Ass'n v. Goodpasture Computer Servs., Inc.,* 807 F.2d 1256, 1259 (5th Cir.1987); *Mississippi Power & Light v. United Gas Pipe Line,* 760 F.2d 618, 621 (5th Cir.1985).

■ A preliminary injunction is an extraordinary remedy. *Black Fire Fighters Ass'n,* 905 F.2d at 65; *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir.1985); *Callaway,* 489 F.2d at 573 (5th Cir.1974). Accordingly, the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *State of Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975).

Furthermore, injunctive relief should only be granted if the movant has clearly carried the burden of persuasion on all four prerequisites. *Black Fire Fighters Ass'n,* 905 F.2d at 65; *Enterprise Int'l,* 762 F.2d 464, 472 (5th Cir.1985); *United Gas Pipe Line,* 760 F.2d at 621; *Apple Barrel Prods. v. Beard,* 730 F.2d 384 (5th Cir.1984); and *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185, 186 (5th Cir.1982). *See* 7 James W. Moore et al., Moore's Federal Practice ¶ 65.-04[1] (2d ed. 1993) (remarking that unlike other circuits which hold that no single factor is determinative, the Fifth Circuit Court of Appeals requires the movant to carry the burden of proof on each factor). Failure to prove even one of the prerequisites means that the request for injunctive relief must be denied. *Vision Ctr. v. Opticks, Inc.,* 596 F.2d 111, 120 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668–69, 62 L.Ed.2d 646 (1980).

■ The Fifth Circuit has established no particular quantum of proof as to each of the four criteria. The district court should use a balancing-type approach in reviewing an application for injunctive relief. *See Louis v. Meissner,* 530 F.Supp. 924, 925 (S.D.Fla. 1981), citing *Seatrain Int'l, S.A.,* 518 F.2d at 180. The heavy burden of proof in justifying an injunction is *wholly* on the movant. *Murillo v. Musegades,* 809 F.Supp. 487, 497 (W.D.Tex.1992), citing *Hardin v. Houston Chron. Publishing Co.,* 572 F.2d 1106, 1107 (5th Cir.1978) (per curiam). The non-moving party bears no burden to defeat the motion for injunctive relief. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 442–43, 94 S.Ct. 1113, 1125–26, 39 L.Ed.2d 435 (1974). In *Treasure Salvors v. Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560 (5th Cir.1981), the Fifth Circuit held that the four factors set forth in *Canal Authority* are inter-related, rather than independent, and compose a four-step analysis which serves as a mechanism to assist the court in determining whether an injunction is necessary to

preserve the court's ability to render a meaningful decision on the merits.

■ In this case, the plaintiffs contend that their constitutional rights under the Fourteenth Amendment of the Constitution of the United States and Title 42 U.S.C. § 2000d have been violated. Plaintiffs ask this court to bandage their constitutional wounds by ordering defendants to reopen State Line Elementary School. To merit this interim relief until a full-blown trial on the merits of this dispute is scheduled, plaintiffs must satisfy the four factors recognized in *Canal Authority*. Alas, as mentioned at the top of this opinion, this court is not persuaded to find in favor of plaintiffs. The court's reasoning is set out below.

## SUBSTANTIAL LIKELIHOOD OF SUCCESS

The closing of schools for purely racial reasons is impermissible under *Brown v. Board of Education of Topeka*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). *See Bell v. West Point Mun. Separate Sch. Dist.*, 446 F.2d 1362, 1363 (5th Cir.1971). However, a particular school may be closed for sound educational or other non-racial reasons. *Mims v. Duval County Sch. Bd.*, 447 F.2d 1330, 1331 (5th Cir.1971) (noting deteriorated building and unhealthful conditions), citing *Carr v. Montgomery County Bd. of Educ.*, 429 F.2d 382, 385 (5th Cir.1970) (noting inferior physical plant), and *Wright v. Board of Pub. Instruction of Alachua County*, 431 F.2d 1200, 1202 (5th Cir.1970) (citing ample educational reasons and absence of proof of discrimination).

In *Fitzpatrick v. Board of Education for the City of Enid*, 578 F.2d 858 (10th Cir. 1978), the Court refers to six factors other courts have used to ascertain whether a school's closing is racially motivated. These six factors are as follows:

(1) the existence of valid nonracial educational reasons for closing school facilities located in predominantly black areas; (2) the condition and adequacy of the facilities at the school being closed; (3) whether the facilities to which the minority students were being transferred were adequate and whether the transfer would cause those facilities to be "overtaxed"; (4) whether the primary or sole reason for the school board's action was the fear that less constitutionally suspect solutions to segregation would lead to "white flight" from the school district; (5) whether the entire or primary burden of integration is placed on black students and teachers; and (6) whether the school board considered alternatives which did not require the closure of predominantly black schools before making a final decision.

*Id.* at 861, citing *Lee v. Macon County Bd. of Educ.*, 448 F.2d 746 (5th Cir.1971); *Bell*, 446 F.2d at 1365; *Carr*, 429 F.2d at 385; *Gordon v. Jefferson Davis Parish Sch. Bd.*, 330 F.Supp. 1119 (W.D.La.), *aff'd*, 446 F.2d 266, 268 (5th Cir.1971).

Defendants assert that all six of these factors are more than friendly to their position. The presence of friable asbestos, say defendants, certainly qualifies as a valid nonracial reason for the closure of State Line Elementary School. The facilities at Leakesville Elementary School where the State Line students were transferred, continue defendants, are adequate and are not overcrowded as the result of this transfer. There is no proof that "white flight" played any role in the decision to close State Line Elementary School, say defendants. Nor, they maintain, is there any competent proof that the entire or primary burden of integration has been placed on black students and teachers. Finally, defendants contend that they considered alternatives to closing State Line Elementary School, to include obtaining federal or state funds, sealing off the asbestos, and actually initiating a bond issue for increasing taxes to pay for the removal of the asbestos.

Defendants' proof on these matters has raised some strong points which, at this stage, pack more persuasive muscle than plaintiffs' presentation to the contrary. Plaintiffs here who have the burden of persuasion simply have not placed enough evidence on the scales at this point to show racial animus or overcome the defendants' pocketbook defense. Therefore, this court is unpersuaded that plaintiffs have shown a

substantial likelihood of success on the merits.

### IRREPARABLE HARM

Irreparable harm in this instance would rest upon plaintiffs' showing that their constitutional rights have been violated. Violation of a constitutional right is irreparable harm, even for minimal periods of time. One who shows deprivation of a constitutional right need go no further in showing the requisite harm for injunctive relief. *See Elrod v. Burns,* 427 U.S. 347, 374, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir.1981). However, since plaintiffs have failed to show any constitutional deprivation sufficient for the issuance of a preliminary injunction, this court finds that plaintiffs have failed to carry this *Canal Authority* factor as well. *Black Fire Fighters Ass'n,* 905 F.2d at 65.

### PUBLIC INTEREST AND BALANCE OF HARMS

This court finds that the public interest is best served by transferring the State Line students away from a facility where they would be exposed to friable asbestos. Although the plaintiffs claim to be exposed to longer bus rides in order to attend school, defendants have shown that white students attending the three remaining elementary schools endure equally long bus rides. Furthermore, the defendants have made a case of financial embarrassment. Imposition of an injunction at this point would only add to the defendants' financial woes and disrupt, if not destroy, their budgetary plans to achieve fiscal integrity. Accordingly, this court finds no basis in these two factors for granting injunctive relief.

### CONCLUSION

Therefore, in light of all of the foregoing, the court finds that the plaintiffs' request for injunctive relief is not well taken at this time, and the same is hereby denied.

This memorandum opinion represents merely truncated findings based upon incomplete submissions of proof by the parties and shall not be construed to indicate the court's position with regard to the final disposition of this matter.

**SO ORDERED AND ADJUDGED.**