**UNITED STATES of America, Plaintiff,**

v.

**Charles Roy McMILLAN and
John Doe, Defendants.**

**Civil Action No. 3:95–cv–633WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Nov. 22, 1995.

Mitzi Dease Paige, U.S. Attorney's Office, Jackson, MS, Elizabeth I. Hack, Pamela K. Chen, Margo J. Schlanger, U.S. Department

of Justice, Civil Rights Division, Washington, DC, for plaintiff U.S.

Stephen M. Crampton, Brian Fahling, American Family Association Law Center, Tupelo, MS, Nathan W. Kellum, American Family Association Law Center, Tupelo, MS, for defendant Charles Roy McMillan.

## ORDER GRANTING PRELIMINARY INJUNCTION

WINGATE, District Judge.

Before the court is plaintiff's motion for injunctive relief against the defendant Charles Roy McMillan. Submitted pursuant to Rule 65,[1] Federal Rules of Civil Procedure, the United States of America, plaintiff, claims that the defendant has violated the Freedom of Access to Clinic Entrances Act (hereinafter "FACE"), Title 18 U.S.C. § 248, et seq.[2] By its motion for injunctive relief, the plaintiff asks this court to find that the defendant has violated the statute and to issue a preliminary injunction prohibiting the defendant from being within twenty-five feet of the Jackson Women's Health Organization. This court has jurisdiction over this dispute under Title 28 U.S.C. § 1331.[3]

On the dates of October 26, 27 and 30, 1995, this court heard evidence and arguments of counsel on plaintiff's motion. Plaintiff called seven (7) witnesses, most of whom are/were employees of the Jackson Women's Health Organization ("JWHO"). Defendant called five (5) witnesses. By its evidence, plaintiff sought to show that on at least three occasions defendant has violated both the spirit and expressed strictures of FACE. According to plaintiff's proof, on May 3, 1995, McMillan, by threat of force, told clinic employees words to the effect "ya'll look like a bunch of birds on a telephone wire waiting to be shot off by a man with a shotgun." Then, McMillan made his hand into the shape of a pistol by extending his index finger and lifting his thumb, proceeded to point his finger at them, as if he were shooting, and said "Pow, pow, pow, pow." Also, according to plaintiff's proof, on May 9, 1995, McMillan, by both threat of force and an attempt to damage or destroy the clinic, told a contractor who was repairing the clinic not to fix the building but to burn it down and asked for the contractor's name and telephone number to arrange this. Finally, according to plaintiff's proof, on September 5, 1995, McMillan committed yet another violation of FACE when, by threat of force, he warned a patient and her escort as they were leaving JWHO that in twenty-four hours God was going to destroy the individuals who worked in the clinic so they should not be there when the explosion occurred.

Defendant McMillan takes issue with each of the above accusations. Indeed, portraying himself as but a peaceful demonstrator on a mission of righteousness, McMillan flatly denies the statements and conduct attributed to him by the plaintiff's witnesses.

## I. DEFENDANT'S MOTION TO DISMISS

Before ruling on plaintiff's motion for injunctive relief, this court first must address defendant's motion to dismiss which attacks the constitutional authority of the United States Congress to enact FACE pursuant to the Commerce Clause[4] and Section 5 of the Fourteenth Amendment to the United States Constitution.[5] Defendant claims that Con-

---

1. Rule 65 of the Federal Rules of Civil Procedure provides for preliminary injunctive relief, notice to the adverse party, requirement of security, and the form and scope of the injunction.

2. Title 18 U.S.C. § 248(c)(2)(A) provides:
 If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court.

3. Title 28 U.S.C. § 1331 provides that: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

4. The Commerce Clause of Article I, section 8, clause 3 of the United States Constitution states: "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; ...

5. Section 5 of the Fourteenth Amendment to the United States Constitution provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

gress unconstitutionally exceeded the scope of its enumerated powers under these provisions and, in so doing, transgressed the restrictions on the Congressional power found in the Tenth Amendment to the United States Constitution.[6] Plaintiff takes the opposite position.

## A. THE STATUTE

Enacted May 26, 1994, FACE prohibits, among other things, anyone, who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." Title 18 U.S.C. § 248(a)(1). The aim of FACE is:

> ... to protect and promote the public safety and health and activities affecting interstate commerce by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive, and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services.

Section 2 of Pub.L. 103–259. The criminal penalties include fines from $10,000 to $25,000 and terms of imprisonment ranging from 18 months to 10 years. Among the civil remedies provided by FACE are temporary, preliminary and permanent injunctive relief. Title 18 U.S.C. § 248(c)(2)(B).

According to the defendant, FACE has no constitutional moorings to the Commerce Clause because, through application of the Act, Congress seeks to regulate a private activity entirely intrastate in character, without any commercial aspect, and which has no direct effect on interstate commerce. Defendant principally champions the holding in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), claiming that its limit of Congressional power under the Commerce Clause reaches to this case and these facts. In *Lopez,* a high school

student was charged with violating the Gun–Free School Zones Act of 1990, Title 18 U.S.C. § 922(q)(1)(A), when he carried a concealed handgun into his high school. *Id.* at ——, 115 S.Ct. at 1626. The United States Supreme Court affirmed the finding of the United States Court of Appeals that Title 18 U.S.C. § 922(q)(1)(A) was not supported by sufficient congressional findings and legislative history. Furthermore, the Supreme Court concluded that § 922(q) did not regulate activity that substantially affected interstate commerce. Instead, the Supreme Court stated that § 922(q) was a criminal statute which, by its terms, had nothing to do with commerce or any sort of commercial activity. *Id.* at —— – ——, 115 S.Ct. at 1630–31. Thus, § 922(q) was found to be invalid as beyond Congress' power under the Commerce Clause. *Id.*

Further, argues defendant, neither does Section 5 of the Fourteenth Amendment safely harbor the Act because Congressional authority under Section 5 of the Fourteenth Amendment is limited to protecting individuals against state action, not against wrongs done by individuals. Defendant cites *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (" 'The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals.' This has been the view of the Court from the beginning. It remains the Court's view today."); *Murphy v. Mount Carmel High School,* 543 F.2d 1189, 1193 (7th Cir.1976) (the Fourteenth Amendment erects no shield against merely private conduct, however discriminating or wrongful); and *United Brotherhood of Carpenters and Joiners, Local 610 v. Scott,* 463 U.S. 825, 830, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983) (noting that plaintiff must show some state involvement to state a claim under the Fourteenth Amendment). Here, says defendant, Congress has stepped over the boundary line separating the two since FACE simply aims to regulate individual invasions of individual rights.

---

**6.** The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Plaintiff responds that in enacting FACE, Congress exercised powers at the heart of its commerce authority, namely, the powers to protect both persons and things in interstate commerce and to regulate activities that have a substantial effect on interstate commerce, citing *Cheffer v. Reno*, 55 F.3d 1517, 1519 (11th Cir.1995), adopting the reasoning of *American Life League, Inc. v. Reno*, 47 F.3d 642, 647 (4th Cir.1995). Overwhelming evidence, says plaintiff, supported Congress' findings that the conduct prohibited by FACE directly interferes with the free flow of commerce, in which patients, providers and goods used and dispensed by reproductive health care facilities travel.

Additionally, says plaintiff, the Fourteenth Amendment provides independent constitutional authority for FACE. Under Section 5, Congress is empowered to enforce the various provisions of the Fourteenth Amendment, including the rights to liberty and equal protection of the laws. Pursuant to this empowerment, argues plaintiff, Congress passed FACE to enforce protection of both the substantive right of women to obtain abortion-related health services and equal protection of the law where state officials are either unable or unwilling to provide that protection. Accordingly, concludes plaintiff, the enactment of FACE was a valid exercise of Congress' authority under Section 5 of the Fourteenth Amendment, relying upon *District of Columbia v. Carter*, 409 U.S. 418, 423 n. 8, 93 S.Ct. 602, 606 n. 8, 34 L.Ed.2d 613 (1973); *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

### B. STANDARD OF REVIEW FOR A MOTION TO DISMISS

"[I]n passing on a motion to dismiss, whether on grounds of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir.1992). Furthermore, the court should accept as true the factual allegations of the complaint. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Blackburn v. City of Marshall, et al.*, 42 F.3d 925, 931 (5th Cir. 1995), citing *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). Finally, "a complaint should not be dismissed ... unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–02; *see also Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir.1991).

### C. THE COMMERCE POWER OF CONGRESS

■ The most basic principle of the Commerce Clause jurisprudence is that "acts which directly burden or obstruct interstate ... commerce, or its free flow, are within the reach of the congressional power." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 31, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937). " 'Whatever amounts to more or less constant practice, and threatens to obstruct or unduly burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause.' " *Hodel v. Indiana*, 452 U.S. 314, 326, 101 S.Ct. 2376, 2384, 69 L.Ed.2d 40 (1981), quoting *Stafford v. Wallace*, 258 U.S. 495, 521, 42 S.Ct. 397, 403, 66 L.Ed. 735 (1922); *accord United States v. Darby*, 312 U.S. 100, 113, 61 S.Ct. 451, 456, 85 L.Ed. 609 (1941) (observing that the commerce power encompasses "those regulations which aid, foster and protect the commerce."). Any offense which thus "interferes with, obstructs, or prevents [interstate] commerce ... may be punished by Congress...." *United States v. Coombs*, 37 U.S. (12 Pet.) 72, 78, 9 L.Ed. 1004 (1838).

■ In *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629, the United States Supreme Court re-identified the three broad categories of activity that Congress may regulate under its commerce power. First, Congress is empowered to regulate the use of channels of interstate commerce. *United States v. Darby*, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256, 85 S.Ct. 348, 356, 13 L.Ed.2d 258 (1964) (" '[T]he authority of Congress to keep the channels of

interstate commerce free from immoral and injurious uses has been frequently sustained and is no longer open to question.'"), quoting *Caminetti v. United States*, 242 U.S. 470, 491, 37 S.Ct. 192, 197, 61 L.Ed. 442 (1917). Secondly, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even where the threat comes only from intrastate activities. *See, e.g., Shreveport Rate Cases*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Thirdly and finally, Congress is vested with the authority to regulate those activities having a substantial relation to interstate commerce. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (holding that the congressional authority to protect interstate commerce is not limited to transactions ... deemed to be an essential part of a "flow" of interstate or foreign commerce.... That power is plenary and may be exerted to protect interstate commerce no matter what the source of the dangers which threaten it. 301 U.S. at 36, 57 S.Ct. at 624). Put another way, Congress is vested with the authority to regulate "those activities that substantially affect interstate commerce." *Lopez*, — U.S. at —, 115 S.Ct. at 1630, citing *Maryland v. Wirtz*, 392 U.S. 183, 196, n. 27, 88 S.Ct. 2017, 2024, n. 27, 20 L.Ed.2d 1020 (1968).

## D. STANDARD OF REVIEW FOR A CHALLENGE TO FEDERAL LEGISLATION

In determining whether a regulated activity substantially affects interstate commerce, the judicial inquiry is governed by the rational basis test. *Katzenbach v. McClung*, 379 U.S. 294, 302, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964); *Maryland v. Wirtz*, 392 U.S. 183, 198, 88 S.Ct. 2017, 2025, 20 L.Ed.2d 1020 (1968); *FERC v. Mississippi*, 456 U.S. 742, 754, 102 S.Ct. 2126, 2134, 72 L.Ed.2d 532 (1982); *Arizona Public Service Company v. Snead*, 441 U.S. 141, 149, 99 S.Ct. 1629, 1634, 60 L.Ed.2d 106 (1979); *Texas v. United States*, 730 F.2d 339, 351 (5th Cir.1984); *Scott v. Moore*, 640 F.2d 708, 726 (5th Cir. 1981); *United States v. Harris*, 25 F.3d 1275, 1280 (5th Cir.1994). *But see Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 476,

101 S.Ct. 715, 730 n. 2, 66 L.Ed.2d 659 (1981) (Powell, J., concurring in part and dissenting in part) ("Commerce Clause analysis differs from analysis under the 'rational basis' test. Under the Commerce Clause, a court is empowered to disregard a legislature's statement of purpose if it considers it a pretext."), citing *Dean Milk Co. v. Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951) ("A different view, that the ordinance is valid simply because it professes to be a health measure, would mean that the Commerce Clause of itself imposes no limitations on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods.").

## E. DEFERENCE TO CONGRESSIONAL FINDINGS

When evaluating a challenge to a federal legislation, courts "must defer to a congressional finding that a regulated activity affects interstate commerce, 'if there is a rational basis for such a finding,' *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981), and ... the means selected by Congress are reasonably adapted to the end permitted by the 'Constitution.'" *Preseault v. I.C.C.*, 494 U.S. 1, 17, 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990), quoting *Heart of Atlanta Motel*, 379 U.S. at 262, 85 S.Ct. at 360. In assessing the rationality of Congress' conclusions, the courts should look to statutory findings as well as congressional committee findings. *Lopez*, — U.S. at —, 115 S.Ct. at 1630. Once the court "find[s] that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, [its] investigation ends." A court's "practice of deferring" ... reflects our respect for the institutional competence of the Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes from Congress' political accountability in dealing with matters open to a wide range of possible choices. *Id.* at ——

——, 115 S.Ct. at 1651–52 (Justice Souter dissenting).

## F. IS FACE A VALID EXERCISE OF CONGRESSIONAL POWER?

"The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow." *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). As stated above, "the court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding. *Id.* Finally, the court must determine "whether the means chosen by Congress are reasonably adapted to the end permitted by the Constitution." *Id.*

In enacting FACE, Congress made the following significant specific findings: that there was "[a] nationwide campaign of anti-abortion blockades" and violence that was "barring access to facilities that provide[d] abortion services," S.Rep. No. 117, 103d Cong., 1st Sess. 3 (1993); H.R.Rep. No. 306, 103d Cong., 1st Sess. 6 (1993), U.S.Code Cong. & Admin.News 1994 at 699, 703; that abortion opponents had committed at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, 2 kidnappings, 327 clinic invasions, 71 chemical attacks, and the murder of Dr. David Gunn, a physician who had performed abortions in Florida and several neighboring states. S.Rep. at 3, 6; H.R.Rep. at 6–7; Conf.Rep., Findings and Purpose, *supra*, at 15, no. 2; that "this conduct [wa]s interfering with the exercise of the constitutional right of a woman to choose to terminate her pregnancy, and threaten[ed] to exacerbate an already severe shortage of qualified providers available to perform safe and legal abortions in this country;" that "many women travel across state lines to seek reproductive health care[,] . . . Reproductive health facilities engage doctors and other staff in an interstate market. . . . These facilities buy medical and office supplies that move interstate commerce . . . [and] 'clinics have been closed because of blockades and sabotage and have been rendered unable to provide services.' " *United States v. White*, 893 F.Supp. 1423 (C.D.Cal.1995), quoting *American Life League v. Reno*, 47 F.3d 642 (4th Cir.1995) (S.Rep. No. 117 at 31; H.R.Rep. No. 306 at 8–9, 1994 U.S.C.C.A.N., 705–706.); that "the avowed purpose of this conduct was to eliminate" . . . abortion services by closing clinics and intimidating doctors; S.Rep. at 11; that "such obstruction 'interferes' with the interstate commercial activities of health care providers, including the purchase and lease of facilities and equipment, sale of goods and services, employment of personnel and generation of income, and purchase of medicine, medical supplies, surgical instruments and other supplies from other states." Conf. Rep., Findings and Purpose, *supra*, at 15, n. 3; and that state and local law enforcement authorities have proved unable or unwilling to address effectively "the systemic and nationwide assault that is being waged against health care providers and patients." In short, the actions of abortion opponents have prevented health care providers from rendering, and patients from receiving, commercial services. S.Rep. at 7, 14; H.R.Rep. at 6.

## G. CONCLUSION

■ This court finds that Congress validly enacted FACE under the Commerce Clause. Congress' detailed findings provide a rational basis for the enactment and that the means selected by Congress are reasonably adapted to the end permitted by the Constitution.

In reaching this decision, this court rejects defendant's argument that Congress' findings of nationwide violence against abortion clinics fail to show a substantive impact on interstate commerce. Defendant argues that Congress' findings of 36 bombings, 81 arsons, 131 death threats, 84 assaults, 2 kidnappings, 327 clinic invasions, 71 chemical attacks and the murder of an abortion doctor do not constitute sufficient data to show a pattern of violence substantial enough to impact interstate commerce. As earlier stated, this court rejects the argument. Congress reasonably apprehends here a growing, escalating eruption of violence; Congress does not have to stay its legislative hand until the perceived problem reaches epidemic proportions.

Additionally, this court rejects defendant's prediction on *Lopez'* reach. When deciding

*Lopez,* the United States Supreme Court did not overturn that body of cases which have shaped the Commerce Clause in the modern era. When the Supreme Court decided *Lopez,* the Court had no congressional data, statistics and findings justifying Congress' reliance on the Commerce Clause. And, moreover, unlike the factual situation in *Lopez* which dealt simply with possession of a firearm in a school zone, here Congress concerned itself with protection of businesses and persons.

■ This court further finds that Section 5 of the Fourteenth Amendment to the United States Constitution empowers Congress to enact FACE insomuch as this section gives Congress the power "to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment, including the provisions dealing with liberty, equal protection, and the privileges or immunities of citizens. The Freedom of Access to Clinic Entrances Act seeks to protect the right to terminate a pregnancy, a right that falls squarely within the rights guaranteed by the Fourteenth Amendment. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992). Furthermore, "Congress did find that 'the interstate nature of this [interstate campaign of violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services] place it beyond the ability of any single state or local jurisdiction to control[.]'" *United States v. White,* 893 F.Supp. 1423 (C.D.Cal.1995). Thus, Section 5 of the Fourteenth Amendment authorizes Congress' enactment of FACE.

In reaching the above conclusions of FACE's constitutional validity, this court finds itself in lockstep with *American Life League, Inc. v. Reno,* 47 F.3d 642 (4th Cir. 1995) (the Court held that in enacting FACE, Congress rationally concluded, based on an extensive legislative record, that the regulated activity of abortion protesting affected interstate commerce and that Congress chose the most reasonable means to a permissible end); *United States v. White,* 893 F.Supp. 1423 (C.D.Cal.1995) (the Court held that Congress was authorized under the

Commerce Clause to enact FACE since violence substantially affects interstate commerce as effects of well-documented and specifically targeted violence have commercial ramifications). *Cheffer v. Reno,* 55 F.3d 1517, 1519 (11th Cir.1995) (in protecting the commercial activities of reproductive health providers, FACE protects and regulates commercial enterprises operating in interstate commerce). *But see United States v. Wilson,* 880 F.Supp. 621 (E.D.Wis.1995) (Congress did not have the inherent power to pass the section of FACE prohibiting non-violent physical obstruction of entrances to reproductive health services clinics, on the ground that it was protecting the exercise of fundamental rights when the section was not a valid exercise of Congress' power under the Commerce Clause or the Fourteenth Amendment).

Therefore, this court denies defendant's motion to dismiss this lawsuit on the grounds that FACE is constitutionally infirm. Rather, this court holds that Congress validly enacted FACE pursuant to its powers under the Commerce Clause and Section 5 of the Fourteenth Amendment to the United States Constitution.

## II. *MOTION FOR PRELIMINARY INJUNCTION*

Having determined that Congress properly enacted FACE under the Commerce Clause and Section 5 of the Fourteenth Amendment, the court now turns to the plaintiff's motion for injunctive relief. The plaintiff asks the court to find that the defendant has violated FACE and to require the defendant to respect a 25 foot buffer zone around the boundaries of the clinic. Defendant opposes plaintiff's request for an injunction, denying the plaintiff's accusations that he violated FACE by threatening clinic patrons and employees on the dates of May 3, May 9, and September 5, 1995.

### A. *RELEVANT FACTUAL FINDINGS*

Defendant Charles Roy McMillan is the founder and executive director of Christian Action Group, an anti-abortion organization. Supported financially by his physician wife, McMillan devotes full time to his uncompro-

mising mission to eradicate abortions. Referring to this mission as a "ministry," McMillan's activism includes demonstrating in front of clinics, sidewalk counseling, circulating petitions, holding candle-light vigils and, on occasion, super-gluing the locks of targeted abortion clinics.

One of the core tenets of McMillan's philosophy is that abortion is murder and that anti-abortionists should respond in accordance with this realization. Indeed, the motto "If you believe abortion is murder, act like it is murder," is embossed on all of the envelopes of the Christian Action Group. McMillan says he sees this "convicting" directive every day.

Sometime during the year of 1994, McMillan wrote and disseminated a paper entitled, "My Point of View Regarding the 'Use of Force, Including Lethal Force, Against Abortionists, and Damage/Destruction of Abortion Facilities.'" In this seven-page polemic, McMillan sets out his reasons for concluding that violence against abortion providers and their clinics is not a sin. In reaching his conclusion, he likens the present day abortion laws in the United States which fail to recognize the rights of unborn persons to the corrupt morality of Nazi Germany of World War II. He postures his struggle against abortion as another great civil rights struggle. He sees abortion as but murder of a helpless human being, which Christians have a duty to prevent, without hesitation, without limits. Accordingly, he concludes:

These understandings have caused me to determine that it is "not sin" to "damage/destroy" abortion facilities or to use force or violence, including lethal force and violence against the abortionists who intend to kill again.

It is "not sin" to pray for God to supernaturally intervene to save a particular preborn baby or all the preborn babies in existence; it is "not sin" to educate people on the humanity of the preborn, both from science and the Bible; it is "not sin" to vote for pro-life candidates and to promote pro-life legislation; it is "not sin" to sidewalk counsel or witness for life on the sidewalks in front of abortion facilities; it is "not sin" to volunteer as a worker at your local crisis pregnancy center; it is "not sin" to participate in a peaceful, illegal (by our civil government's laws) intervention by trespassing onto the property of an abortion facility and blocking the entrances with your limp body; it is "not sin" to withhold taxes to a civil government that endorses the killing of preborn babies and protects the killings with tax-payers' funds;

AND IT IS "not sin" to "super-glue" the locks of abortion facilities in order to stop the killing, even if but for a short while; it is "not sin" to enter an abortion facility and destroy the abortion machinery; it is "not sin" to burn down abortion facilities; it is "not sin" to wound an abortionist intent on continuing the killing; and it is "not sin" to kill an abortionist who intends to continue slaughtering babies.

In that same discourse, defendant appears to hesitate in endorsing any killings at the present time, stating:

I acknowledge that killing *must* be the last resort. Only when all other efforts to stop violence and killing have failed is killing justifiable in the three cases of self-defense, defense of others, and "just wars." Diplomacy, peaceful intervention, petitioning, sidewalk counseling, fist-fighting, and prayer must have all failed before force and/or violence are legitimate.

However, that hesitancy is no longer an aspect of McMillan's philosophy. McMillan is a signatory on a petition disseminated by "Defenders of the Defenders of Life." Apparently circulated after Paul Hill killed Dr. John Britton and his bodyguard, James Barrett and wounded Mrs. Barrett, in Pensacola, Florida, the petition declares:

We, the undersigned, declare the justice of taking all godly action necessary, including the use of force to defend innocent human life (born and unborn). We proclaim that whatever force is legitimate to defend the life of a born child is legitimate to defend the life of an unborn child.

We declare and affirm that if in fact Paul Hill did kill or wound abortionist John Britton and accomplices James Barrett and Mrs. Barrett, his actions are mor-

ally justified if they were necessary for the purpose of defending innocent human life. Under these conditions, Paul Hill should be acquitted of all charges against him.

On innumerable occasions, defendant has publicly stated his belief that abortion is murder and that his goal is to shut down abortion clinics through any means possible. Defendant has expressed these views in the print media, as well as on television, both locally and nationally. Most recently, in January of 1995, defendant told a local newspaper that "They [clinic operators] have reason to fear. They see that force, violence and destruction being used to stop destruction and violence of unborn people is not a sin but is a justifiable act." Around the same time, in an interview with a local television reporter, the defendant stated that "Sometimes loose cannons become heroes." He also stated that "Force and violence are not inappropriate to stop the killing of innocent children."

The Jackson Women's Health Organization ("JWHO") is a medical facility that provides patients with reproductive health services, including, but by no means limited to, pregnancy termination. It is housed in a one-story free-standing building located at 2903 North State Street, Jackson, Mississippi. The clinic is bounded by: North State Street to the east; Fondren Place, where the main entrance to the clinic is located, to the south; the clinic's parking lot to the west; and a sidewalk and grass strip separating the clinic and the building occupied by a doctor to the north. The width of the sidewalk on Fondren Place is about six feet and the width of the sidewalk on North State Street is about seven feet. Fondren Place is approximately thirty feet wide, and North State Street, the main thoroughfare, is approximately forty-eight feet wide. The entrance to the clinic parking lot is located forty-five feet from the clinic's main entrance.

Since JWHO's opening in February 1995, the defendant has been a constant fixture. At least two days a week, for approximately four hours each day, the defendant is on or within the parameter of the sidewalk outside the clinic gates, carrying anti-abortion placards and attempting to distribute literature to patients and their escorts entering and exiting the clinic gates. The defendant also places his anti-abortion placards on the sidewalk in front of and on the side of the clinic or props them against his car which is normally parked across the street. At one time his car bore a bumper sticker which stated: "Execute abortionists and murderers." The placards are approximately two feet by three feet in size and are easily visible to anyone entering or passing by the clinic.

Clinic employees are aware of the attacks that have been made on clinics where abortions are performed nationally, as well as physical attacks on and the murders of clinic workers, volunteers and physicians.[7] Clinic employees have also seen the defendant on both local and national television advocating the killing of clinic employees and doctors who perform abortions. Additionally, clinic employees have heard statements of the defendant in the local and national press that he advocates the killing of clinic employees and abortion doctors. And, at least one clinic employee has seen a copy of the Defenders of Defenders of Life Petition bearing the defendant's signature.

On May 3, 1995, at approximately 8:30 a.m., clinic employees Stacy Spencer, Traci Triplett, Bessie Spriggins, and Ronald Hubbard were walking towards the rear entrance of the clinic from the parking lot located at the north end of clinic. The defendant, who was standing by the driveway entrance, allegedly shouted at the four clinic employees that "you all look like birds on a wire waiting to be shot with a shotgun." Supposedly, the defendant then made his hand into the shape of gun and pantomimed shooting them while saying, "Pow, Pow, Pow, Pow." Spencer, Triplett, and Spriggins testified that they noticed that the defendant seemed more agitated than usual. They further testified that they felt threatened and believed that the defendant was serious in his intent to harm them. As a result of this incident, for the first time since its opening, the clinic went to a "locked door" policy, whereby the front

---

7. During the course of this hearing, the parties mentioned the murder of Dr. Britton in Florida and the murder of a receptionist at a reproductive health clinic in Massachusetts.

door was locked and only patients with appointments were allowed into the building.

Plaintiff next charges that on May 9, 1995, the defendant approached Joseph Vestal, a contractor hired to make repairs on the building, about destroying the building. This alleged attempted solicitation of arson was witnessed by two clinic employees, Traci Triplett and Ronald Hubbard, and Cory Scott, Vestal's helper. These witnesses testified that the defendant told Vestal that he should burn the clinic down rather than fix it. Vestal then reportedly replied that if the defendant were to pay him as much as he had been paid to build it, then it might be possible. McMillan then supposedly stated that such could "be arranged" and attempted to give Vestal his name and telephone number. Vestal and the other witnesses testified that Vestal then brushed him off.

The two clinic employees who observed and heard this exchange testified that they felt threatened by the defendant's statements and believed that the defendant meant to harm them and the clinic. Furthermore, Vestal and his helper, Scott, both from Florida, neither of whom had ever seen or heard of the defendant prior to that day, both testified that they believed that the defendant was intimidating and actually wanted to harm the clinic. Vestal described the defendant's demeanor as being like a "monster," while Scott described the defendant's temperament as "going ballistic." Following this incident, the clinic workers promptly notified law enforcement officers of the incident.

According to the plaintiff, on September 5, 1995, another incident occurred. As a patient and her escort were leaving the clinic, the defendant allegedly stated: "Ladies, there's no need to come back, in 24 hours God's going to destroy the clinic and you shouldn't be here when the explosion occurs." In the near vicinity stood Ronald Hubbard, the clinic's security guard. Hubbard testified that although the defendant mentioned God, Hubbard did not categorize McMillan's statement as a religious expression; rather, Hubbard stated he felt that McMillan was threatening imminent destruction of the clinic by human hands. Based on the circumstances of this incident and the clinic staff's

knowledge of the defendant's endorsement of force and violence to stop abortions as well as their knowledge of clinic violence nationwide, the clinic employees testified that they were of the opinion that the defendant intended to harm them. Again, law enforcement officials were notified.

At the hearing on this matter, McMillan admitted to signing the "Defenders of the Defenders of Life" petition, to disseminating the memorandum in which he expressed his point of view that it was not a sin to terrorize or kill abortion providers and that he considered the murder of abortion provider John Britton, justifiable murder, although, the defendant quickly added, he would never do it himself.

Relative to his conduct and the statements attributed to him on the days in question, McMillan denies making the statements and avers that his actions were only misunderstood. McMillan acknowledges shouting at the four clinic workers, Stacy Spencer, Traci Triplett, Bessie Spriggins, and Ronald Hubbard on May 3, 1995. However, McMillan denies comparing them to four birds on a wire waiting to be shot while shaping his hand into a gun and saying "pow, pow, pow, pow." Instead, testified McMillan, on May 3, 1995, he was present at JWHO, standing over 70 feet away from the clinic employees and the security guard, on the public sidewalk in front of Fondren Place, and behind an iron rod fence, in order to communicate his pro-life views. When he saw the three clinic workers and a security guard standing together, he says he made a remark to the effect that they looked like a bunch of birds on a wire and that a lightening bolt could come down and strike them. At the time of the comment, he says he did not make his hand into the shape of a pistol, but instead pointed to the sky and then brought his left arm down, pointing straight ahead in the direction of the security guard, Ronald Hubbard. He denies ever saying, "pow, pow, pow, pow."

McMillan also takes issue with plaintiff's account of the May 9, 1995, incident involving Joseph Vestal, the contractor. According to McMillan, plaintiff's witnesses Joseph Vestal, the contractor; his helper, Cory Scott; clinic

employee Traci Triplett and security guard Ronald Hubbard probably misheard his comments due to the noise generated by a nearby operating lawn mower, or have simply fabricated the seriousness of his remarks. McMillan claims his conversation with the contractor was not a serious one, that the contractor, contrary to his in-court testimony, too, thought the matter to be but a joke. According to McMillan, he did talk to Vestal and probably even tried to hand some pro-life literature to Vestal which may have contained his telephone number. But, says McMillan, this was but an effort to further educate Vestal on the evils of abortion, and not to follow up on some notion to contract the building's destruction.

McMillan testified that he does not specifically recall making the September 5, 1995, statement attributed to him. If he said anything at all, says McMillan, he probably said something to the effect that if God destroys the clinic, clinic workers should not be in there when it happens. If he said something such as this, McMillan says he was not communicating a threat, but simply warning of God's abhorrence towards abortion. McMillan says he is God's witness about the truth of salvation and the ills of abortion. He denies having claimed to be God's messenger contrary to the testimony of plaintiff's witnesses.

In addition to himself, McMillan called to testify his fellow pro-lifers, Shirleen Meadows and Doug Lane. Neither of the two was present with the defendant at the clinic on the dates of May 3, May 9, or September 5. Essentially character witnesses, these two witnesses attested to McMillan's good character and described how he kept vigil at the clinic distributing pro-life literature and seeking by legal means to dissuade clinic patients from undergoing abortion. Neither Meadows nor Lane subscribes to McMillan's philosophy of violence. Meadows appeared genuinely surprised that McMillan, whom she described as a wonderful human being, would espouse murder. She said she would not follow McMillan if he advocated murder of abortion providers. Lane testified that he was aware of McMillan's beliefs, but that he

[Lane] disagreed with McMillan. Both witnesses, Meadows and Lane, acknowledged on cross-examination that the statement "you all look like birds on a wire waiting to be blown away with a shotgun, pow, pow, pow, pow" could constitute a threat.

### B. *STANDARD*

▋ "[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974). A party seeking the equitable remedy of a preliminary injunction must meet four criteria in order to prevail. First, the moving party must demonstrate a substantial likelihood of success on the merits. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir.1991); *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974); *Hill v. Greene School District*, 848 F.Supp. 697, 704 (S.D.Miss.1994); *Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618 (5th Cir.1985). Secondly, the moving party must prove that there is a substantial threat that failure to grant the injunction will cause irreparable harm. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974). However, as in the instant case, where a statute expressly provides for injunctive relief, irreparable harm is presumed and need not be established. *EEOC v. Cosmair, Inc., L'Oreal Hair Care Division*, 821 F.2d 1085, 1090 (5th Cir.1987); *United States v. Hayes International Corp., et al.*, 415 F.2d 1038, 1045 (5th Cir.1969). Thirdly, the moving party must demonstrate that the threatened injury outweighs any harm the injunction may cause the opposing party. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974). The fourth and final criteria is that the injunction will not disserve the public interest.

### C. *PROPRIETY OF AN INJUNCTION*

Due to the recent eruptions of violence over reproductive health facilities,[8] Congress enacted FACE to protect the health and

---

8. See p. 1261 of this opinion.

safety of the public by banning violence and threats of violence on abortion providers and abortion facilities. In enacting FACE, "Congress has recognized that intimidation, threats, and physical confrontations ... cause harm not only to providers of services but also to patients who seek those services." *U.S. v. Dinwiddie*, 885 F.Supp. 1286 (W.D.Mo.1995). Threats are covered by FACE where it is reasonably foreseeable that the threat would be interpreted as a serious expression of an intention to inflict bodily harm. S.Rep. No. 117, 103d Cong., 1st Sess. at 23. Furthermore, the Supreme Court of the United States has recognized the importance of injunctive relief in ensuring a woman's right to obtain a legal abortion, the flow of free public traffic, medical privacy and public safety. *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Accordingly, this court is empowered with broad discretion to craft a carefully tailored injunction to ensure that the defendant stays within the bounds of the law, provided the proponent of the injunction has satisfied the aforementioned criteria. *See Gore v. Turner*, 563 F.2d 159 (5th Cir.1977). This may include drafting an injunction which creates a buffer zone around the reproductive health facilities.

In response to the defendant's alleged past violations of FACE, the plaintiff here asks this court to issue an injunction creating a 25 foot buffer zone around the Jackson Women's Health Organization clinic. The defendant opposes the motion and contends that the issuance of an injunction would be an infringement upon his right to free speech as guaranteed by the First Amendment. Having considered the motion, the memorandum submitted in favor of and in opposition to the motion, as well as the testimony of witnesses and oral argument by counsel, this court is persuaded that the preliminary injunction should issue.

### 1. *Substantial Likelihood of Success on the Merits*

■ It is well-settled that in order to obtain a preliminary injunction a plaintiff need not show that it is certain to win. 11 C. Wright & A. Miller, Federal Practice & Procedure, § 2948 (1973). Rather, a party seeking preliminary injunction need only prove that it has a substantial likelihood of succeeding on the merits. *Id.*

■ The plaintiff has met this burden, having shown by its proof a substantial likelihood at trial that plaintiff will be able to prove that defendant McMillan violated FACE on several occasions. Although McMillan denies the statements and conduct attributed to him by the United States, this court is persuaded that the weight of credibility disfavors McMillan. In reaching its decision, this court took into account the demeanor of the witnesses and the logical consistency of the versions. Along the way to its decision, this court also took into account the historical unpleasantness the clinic workers and McMillan have exhibited towards each other. Further, the court has noted that the battle lines of the testimony do not simply pit against each other the testimony of pro-lifers against the testimony of pro-choicers. Cory Scott is pro-life, yet he testified against McMillan.

Then, there is one other very significant factor in the court's calculus of credibility. McMillan openly preaches defiance of the civil law and openly advocates violence and even murder. Speaking for God, he proclaims that it is not a sin to wound or injure an abortion provider. He openly announces that under God's Law, it is not a sin to murder an abortion provider. While denying that he personally would ever take a life, he cheers on those who would and apparently hopes to persuade others to accept his views. Is it not reasonable then to assume that one who has advocated violence in public writings and even in the media would continue to do so when confronted by the very people he scorns?

Moreover, McMillan's theology is disturbing and leaves this court wondering to what extreme would McMillan go in his fight against abortion. If McMillan's God endorses the assault and murder of abortion providers, would McMillan's God also excuse lying under oath in order to further his "ministry" and undermine the credibility of those opposed to that "ministry?"

Hence, this court finds that plaintiff has shown that defendant endorses force and violence as a means to protest against abortion. This court further finds that at a trial on the merits plaintiff has a substantial likelihood of showing that the defendant has committed a total of three violations of FACE—three threats of force on the dates of May 3, 1995; May 9, 1995; and September 5, 1995. Defendant issued each threat with the intent to injure, intimidate or interfere with a person seeking or providing reproductive health care.

In determining that defendant issued a threat on September 5, 1995, this court has reviewed the circumstances and context of the speech involved and is satisfied that defendant did indeed state that the clinic would be destroyed in 24 hours and that such statement was meant to be an unlawful threat instead of a harmless evangelical expression of God's displeasure. The targets of this threat were a clinic patient and her escort.

The plaintiff additionally campaigns for a court finding that on May 9, defendant's actions also amounted to an attempt to destroy the clinic. Plaintiff asks the court to believe that defendant actually attempted to negotiate a contract with Vestal to destroy the clinic building. This court finds it more likely, however, that aware that clinic personnel were listening to his conversation with Vestal, defendant meant only to frighten the clinic workers by his conversation. While this court is inclined to this view of the circumstances, the court acknowledges that plaintiff's position, too, has some vitality when one considers: (1) that defendant does not believe it a sin to destroy an abortion clinic; (2) that defendant may not at first have noticed the clinic employees; and (3) that defendant appeared wild and monstrous that day. Still, on balance, this court is persuaded that defendant calculated the topic of his conversation with Vestal and his apparent fascination with such in hopes of intimidating a clinic staff already on edge because of the escalated violence nationwide against abortion clinics. So, this court is persuaded by the evidence that on May 3rd, May 9th and September 5, defendant made threats outlawed by the strictures of FACE.

Further, this court finds that defendant has failed to show that "there is no reasonable expectation that the wrong will not be repeated." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Once the plaintiff has established that a violation of the statute has been committed, it is the defendant's burden to show that it is unreasonable to expect that the wrong will be repeated. *Id.* The defendant has not shown that he will be able to meet this burden.

### 2. *Irreparable Injury*

As previously stated, where preliminary injunctive relief is expressly authorized by a civil rights statute, irreparable harm is presumed from the very fact that the statute has been violated. *EEOC v. Cosmair, Inc., L'Oreal Hair Care Division*, 821 F.2d 1085, 1090 (5th Cir.1987); *United States v. Hayes International Corp., et al.*, 415 F.2d 1038, 1045 (5th Cir.1969); *Middleton–Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir.1981). Thus, the fundamental showing to be made by the plaintiff is that the statutory violation exists. This court has reached that conclusion, so the presumption here applies.

However, even in the absence of this presumption, this court would find irreparable injury. So long as clinic patients and workers have to endure threats of force against them and the clinic, they would be inhibited in their exercise of their constitutional rights to obtain and provide reproductive health services. If allowed unabated, threats of this variety and carnage with their devastating effects would irreparably harm clinic patients and employees.

### 3. *Harm to the Defendant*

Defendant asserts that this court's issuance of an injunction would infringe upon his right to free speech as guaranteed by the First Amendment to the United States Constitution.[9] While it is a basic

9. The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free

principle of constitutional law that the defendant has a right to protest, *Terminiello v. City of Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Cox v. State of Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *CISPES (Committee in Solidarity with People of El Salvador) v. FBI,* 770 F.2d 468 (5th Cir.1985); *Wright v. City of Montgomery, Alabama,* 406 F.2d 867 (5th Cir.1969); *Davis v. Francois,* 395 F.2d 730 (5th Cir.1968), he does not have a right to protest violently or to put people in fear that his protest might become violent. *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Carroll v. President Com'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *R.A.V. v. City of St. Paul, MN,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Smith v. Grady,* 411 F.2d 181 (5th Cir.1969). Accordingly, this court holds that the threatened injury to the clinic, its employees, patients and the public at large, outweighs any harm the injunction may cause the defendant. Moreover, the defendant is hard-pressed to demonstrate how he would suffer any harm at all. The injunction would simply prohibit defendant from making threats or otherwise violating FACE. This in no way would infringe upon his speech rights because FACE regulates unprotected threats of force and other types of unprotected conduct. The 25 foot buffer zone created by the injunction, although a minor burden, is "no more burdensome to the [defendant] than necessary to provide relief to the plaintiffs," *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, ——, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593 (1994). The injunction will not silence the defendant nor chill his right to free speech under the First Amendment. Despite the injunction, the defendant will be able to continue to engage in expressive activities that are constitutionally protected, such as peacefully carrying picket signs, making speeches, distributing literature, and praying in front of the clinic—only it will be at a reasonable distance from the clinic and its employees and patients.

### 4. *The Public Interest*

■ ˙ By enacting FACE, Congress has determined that the public interest is served when individuals who seek to provide or obtain reproductive health services can do so free from threats, intimidation and interference. *See United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In fact, to further this determination, Congress has authorized the Attorney Generals of the United States and the individual states to commence civil actions in the appropriate district courts when he or she has reasonable cause to believe that any person or group of persons may be injured by the conduct prohibited by FACE. *See* 18 U.S.C. § 248(c)(2)(A), (3)(A). Accordingly, the courts are authorized to award the appropriate relief, including injunctive relief. *See* 18 U.S.C. § 248(c)(2)(B), (3)(B).

■ Thus, it is clearly within the public interest for this court to order injunctive relief against the defendant. It will help to keep clinic workers safe from harm by affording protection from the defendant's threats or any irrational impulses to act upon the threats. Consequently, women's access to safe and vital reproductive health care will be ensured. Additionally, the injunction makes it more difficult to carry out any threats while simultaneously allowing the defendant to engage in his protected speech within the bounds of the law. Therefore, an injunction will promote and serve the public interest by protecting the interests that FACE was designed to protect.

### D. *THE BUFFER ZONE*

■ An injunction must be narrowly tailored so as not to burden the defendant any more than necessary to provide relief to the plaintiff. *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, ——, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593 (1995). The twenty-five foot buffer zone requested by plaintiff is appropriate and is not arbitrary. It is narrowly tailored to the evidence presented in this case. *See United States v. Dinwiddie,* 885 F.Supp. 1286 (W.D.Mo.1995).

exercise thereof; or abridging the freedom of speech, or of the press; or the right of the

people peaceably to assemble, and to petition the Government for a redress of grievances.

A twenty-five foot buffer zone will roughly put the defendant across the street from the clinic. With this distance between him and the clinic, its employees and the patients, the defendant will be able to exercise his right to free speech while clinic employees and patients may take some solace that any threats of force or attempts to damage clinic property by the defendant will be more difficult to carry out.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that:

1. Pending trial on the merits, defendant Charles Roy McMillan ("McMillan") and his agents, servants, employees and all individuals acting in concert with him who receive notice of this Preliminary Injunction by personal service, receipt of the Preliminary Injunction, or by being informed of the pertinent contents of the Preliminary Injunction or the "Notice" provided in paragraph 4 below, from committing any of the following acts or aiding, abetting, directing or inciting others from committing any of the following acts:

 a. Using force or threats of force to interfere with or intimidate employees or patients of the Jackson Women's Health Organization, Inc. ("JWHO"), in violation of the FACE statute;

 b. Intentionally damaging or destroying JWHO, or attempting to do so, in violation of the FACE statute;

 c. Being physically located within 25 feet of JWHO's property line; and

 d. Engaging in any conduct violative of FACE anywhere.

2. Willful disobedience of this Preliminary Injunction or resistance to this court's lawful order, rule, decree or command may subject any person subject to this Preliminary Injunction who commits such an act to criminal or civil prosecution for contempt of court. *E.g.,* Title 18 U.S.C. §§ 401, 402.

3. The law enforcement officers empowered to enforce this Preliminary Injunction may also give persons subject to this Preliminary Injunction notice of its pertinent contents by informing them of the pertinent contents of the following Notice. If persons or their attorney have received notice of this Preliminary Injunction, this additional notice is not required.

4. The Notice is:

"The United States District Court for the Southern District of Mississippi in the case of *United States v. Charles Roy McMillan and John Doe,* 3:95–cv–633WS, has ordered that defendant McMillan and his agents, servants, employees and *all individuals acting in concert with him* who receive actual notice of this Preliminary Injunction by personal service, actual receipt of this Preliminary Injunction by personal service, actual receipt of this Preliminary Injunction or by being informed of the contents of this "Notice," are hereby immediately ENJOINED and RESTRAINED from committing any of the following acts or aiding, abetting, directing or inciting others from committing any of the following acts:

 a. Using force or threats of force to interfere with or intimidate employees or patients of the Jackson Women's Health Organization, Inc., ("JWHO"), in violation of the FACE statute;

 b. Intentionally damaging or destroying JWHO, or attempting to do so, in violation of the FACE statute;

 c. Being physically located within 25 feet of JWHO's property line; and

 d. Engaging in any conduct violative of FACE anywhere.

YOU ARE HEREBY DIRECTED TO CONFORM YOUR CONDUCT TO THE REQUIREMENTS OF THIS PRELIMINARY INJUNCTION. IF YOU DO NOT, YOU MAY BE IMMEDIATELY ARRESTED. IF YOU DO NOT, YOU MAY ALSO HAVE TO PAY A CIVIL CONTEMPT FINE, PER DAY, UNTIL YOU COMPLY WITH THIS PRELIMINARY INJUNCTION. YOU ARE HEREBY ORDERED TO OBEY THIS PRELIMINARY INJUNCTION.

**SO ORDERED AND ADJUDGED.**